**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EVELYN RAMAGE, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| RESCOT SYSTEMS GROUP, INC., et al., | : | |
| Defendants. | : | NO. 10-1120 |

**M E M O R A N D U M**

GENE E.K. PRATTER                                    DECEMBER 6, 2011

## I.     INTRODUCTION

Plaintiff Evelyn Ramage was diagnosed with a brain tumor in May 2008.  She requested and received leave from her employer, Rescot Systems Group, Inc. ("Rescot") to recover from surgery to remove the tumor.  Ms. Ramage claims that prior to her surgery, during her recovery, and upon her return to full-time employment, her supervisors and co-workers subjected her to discriminatory treatment on account of her purported disability and her request for leave. Additionally, only two and a half months after her return from leave, Ms. Ramage was fired from Rescot for engaging in unprofessional behavior, which she claims was a pretext for discriminatory retaliation.

Ms. Ramage filed this action against Rescot, Omnicare ESC LLC, and Omnicare Inc.[1] (collectively, the "Defendants") claiming actual disability discrimination, perceived disability

---

[1] Rescot is an indirect subsidiary of Omnicare, Inc.  See Def. Ans. ¶ 7.  Omnicare ESC LLC, also a subsidiary of Omnicare, Inc., is the corporate entity which has issued paychecks related to Ms. Ramage's employment with Rescot since 2007.  See Def. Ans. ¶ 9.

1

discrimination, retaliation, and hostile work environment under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"), actual disability discrimination, perceived disability discrimination, retaliation and hostile work environment under Pennsylvania Human Relations Act, 43 P.S. § 951 et seq. ("PHRA"), and interference and retaliation under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA").  Following discovery, Defendants filed a Motion for Summary Judgment on all of Ms. Ramage's claims.

For the reasons discussed below, the Court will deny the Defendants' Motion with respect to Ms. Ramage's claims of retaliation under the ADA, PHRA, and FMLA, and grant the Defendants' Motion for the remainder of the claims in Ms. Ramage's Complaint.

## II.     FACTUAL BACKGROUND[2]

Ms. Ramage began working with Rescot, a small office with a casual environment, in September 2001 as a receptionist/administrative assistant and remained in that position for her entire time with the company.  (Pl. Stmt. Facts ¶¶ 1-2, 94-95).  Ms. Ramage was responsible for answering the telephone and completing standard administrative duties such as filing, billing, and mailings.  (Pl. Stmt. Facts ¶¶ 4-5).  From March 27, 2006 until September 26, 2008, her immediate supervisor was Christine Tinari, who reported to Glen Lloyd, the President of the company.  (Pl. Stmt. Facts ¶¶ 7-8).

During her tenure with Rescot, Ms. Ramage had various health problems.  In 2007 and early 2008 she missed work due to a back injury and carpal tunnel syndrome.  (Def. Stmt. Facts ¶¶ 27-33).  Additionally, throughout her employment with Rescot, Ms. Ramage suffered from

---

[2] The factual history is undisputed unless otherwise noted.  Where there is a factual dispute, as long as Ms. Ramage has record support for her position, the facts are viewed in the light most favorable to her.

migraine headaches, but never missed work on account of them.  (Pl. Stmt. Facts ¶ 16; Pl. Ex. A,

Pl. Dep. 172:17-173:5).  Beginning in March 2008, Ms. Ramage began to lose vision in her left

eye, lost some peripheral vision, and "was banging into walls."  (Pl. Ex. H, 6/24/2008 Medical

Records; Pl. Dep. 153:11-14).  On May 23, 2008, Ms. Ramage learned that the cause of her

vision loss was a brain tumor.  (Pl. Stmt. Facts ¶ 18).  After informing her superiors of her

condition, on May 27, 2008, Ms. Ramage underwent surgery to remove the tumor.  (Pl. Stmt.

Facts ¶¶ 18-19).  Once the tumor was removed, Ms. Ramage regained vision in her left eye, and

was subsequently only limited in peripheral vision "underneath [her] nose."  (Pl. Ex. H; Pl. Ex. I,

8/28/2008 Medical Record; Pl. Ex. P, 9/19/2008 Medical Record; Pl Dep. 170:18-19; 171:15-

172:16).   She continued to experience migraine headaches, though the headaches were much

less severe, and she was able to control their effects with Excedrin.  (Pl. Dep. 172:20-173:5).

On account of the surgery and her recovery therefrom, Ms. Ramage took a medical leave

of absence from Rescot under the FMLA from May 26, 2008 until July 7, 2008.  (Pl. Stmt. Facts

¶¶ 19, 29).  Additionally, she took intermittent FMLA leave from July 7, 2008 until July 14, 2008

while working part-time.  (Pl. Stmt. Facts ¶¶ 20, 30).  Upon her return to work full-time, Ms.

Ramage attended follow-up appointments for ongoing medical treatment on a near-weekly basis

and took paid time off on other days for matters related to her brain surgery.  (Pl. Stmt. Facts ¶¶

22, 32).

Before, during, and after her recovery from brain surgery, Ms. Ramage claims she

endured sustained harassment and abuse at the hands of her supervisors and co-workers.  Ms.

Ramage testified that when she began experiencing vision problems in March 2008, Ms. Tinari

commented that "if you don't stop knocking into the walls and stuff, I'm going to have to put you

3

out on disability or something." (Pl. Stmt. Facts ¶ 33; Pl. Dep. 153:18-21). During her leave of absence, Ms. Tinari repeatedly called Ms. Ramage's treating physician to inquire when she would return, a practice Ms. Ramage says made her feel guilty about missing work. (Pl. Stmt. Facts ¶¶ 36-37; Pl. Dep. 117:17-22). When Ms. Ramage addressed with Ms. Tinari the perceived pressure from a co-worker for her to return to the office, Ms. Tinari told her to "blow it off." (Pl. Stmt. Facts ¶ 39; Pl. Dep. 168:19-169:15).

After returning to the office and communicating to her supervisors that she would need additional time off related to her surgery, Ms. Ramage claims that management and her co-workers alike subjected her to negative treatment and made her feel stupid, like "a moron," and even ignored her. (Pl. Stmt. Facts ¶¶ 41, 46, 47; Pl. Dep. 129:19-130:1, 181:8-182:2). Some Rescot employees, she claims, acted with hostility toward her. (Pl. Stmt. Facts ¶ 44; Pl. Dep. 174:17-20). For example, her co-worker, Joanne Sullivan, who Ms. Ramage described as being "the office bully,"[3] would walk by Ms. Ramage's desk and "growl." (Pl. Dep. 178:10-18). She further testified that Ms. Tinari, told her, "gee, last year you were out of work around this time for a back injury, and now this year it's for a brain tumor, I wonder what you're going to do next year to top this." (Pl. Stmt. Facts ¶ 38; Pl. Dep. 65:9-13).

Ms. Ramage claims that this negative treatment also included receiving new responsibilities which she felt uncomfortable doing, such as booking travel,[4] and having her existing work notes removed without explanation. (Pl. Stmt. Facts ¶¶ 51-53, 63). Ms. Ramage

---

[3] Ms. Ramage noted that Ms. Sullivan "was known to yell, cuss, and scream," and "all but called [her] a moron every day," for Ms. Ramage's seven years with the company.  (Pl. Dep. 178:2-14).
[4] The Defendants assert that as far back as June 1, 2007 Ms. Tinari had told Ms. Ramage that she expected her to assist with travel reservations, but that Ms. Ramage had resisted in taking on the responsibility.  (Def. Ex. D, 6/1/2007 Meeting Notes; Pl. Ex. B, Tinari Dep. 39:1-39:16; Pl. Dep. 93:2-93:16).

addressed her concerns over Ms. Tinari's and Ms. Sullivan's treatment of her with Mr. Lloyd on the day before her termination.  (Pl. Stmt. Facts ¶ 77; Pl. Dep. 59:24-60:8).  According to Ms. Ramage, Mr. Lloyd stated not only that "any monkey" could perform Ms. Ramage's job and that he considered eliminating it, but also, that "he brought [the] possibility up" that her condition "might put the company in a higher insurance bracket, possibly."  (Pl. Stmt. Facts ¶¶ 77, 80; Pl. Dep. 184:2-18; 135:20-22).

On September 26, 2008, just one day after her conversation with Mr. Lloyd, Rescot terminated Ms. Ramage's employment citing "unprofessional behavior."  Prior to her termination, Ms. Ramage had been reprimanded for unprofessional behavior on multiple occasions.  For example, in October 2006, Rescot issued a written warning regarding Ms. Ramage's inappropriate e-mail communications and revoked her ability to send "blast," or reply-all, e-mails to employees.  (Def. Stmt. Facts ¶ 5).  Additionally, her performance reviews for the years 2006, 2007, and 2008 demonstrated that Ms. Ramage acted in an unprofessional manner, had a tendency to "overreact to minute issues and minimize[ ] large issue[s]," and escalated situations unnecessarily.  (Def. Stmt. Facts ¶ 11-15).  The day before her termination, Ms. Ramage sent an e-mail to Ms. Sullivan, on which another employee was copied, stating, *inter alia*, "[s]o chill out, OK?" and other comments that Ms. Tinari deemed inappropriate for the workplace.  (Pl. Ex. AA).  Ms. Tinari felt that this e-mail, along with Ms. Ramage's previous unprofessional actions, was sufficient grounds for Ms. Ramage's termination.  After seeking the approval of Mr. Lloyd,[5] Ms. Tinari terminated Ms. Ramage from Rescot the next day.  (Pl. Stmt.

---

[5] Although Ms. Tinari could recommend an employee for termination, she lacked the authority to unilaterally terminate Ms. Ramage without approval from Mr. Lloyd.  (Pl. Stmt. Facts ¶ 13).  Ms. Sullivan, who was not Ms. Ramage's supervisor or manager, but who would assign her administrative tasks, did not have any authority or say in making the decision to fire Ms. Ramage.  (Def. Stmt. Facts ¶ 18).

Facts ¶ 122-123).

Ms. Ramage contends that she was fired not because of Rescot's professed reason, but rather due to her disabilities, perceived disabilities, and her FMLA leave.  Accordingly, Ms. Ramage filed a timely charge of discrimination with the Equal Opportunity Employment Commission ("EEOC") on February 23, 2009.  After the EEOC issued a right-to-sue letter, on March 15, 2010, Ms. Ramage filed a Complaint against the Defendants alleging that they (1) discriminated against her in violation of the ADA and PHRA, (2) terminated her in retaliation for exercising her rights under FMLA and/or requesting an accommodation under the ADA and PHRA, (3) subjected her to a hostile work environment under the ADA and PHRA, and (4) interfered with her rights under the FMLA.[6]   After conducting discovery, the Defendants filed this Motion for Summary Judgment.

## III.    LEGAL STANDARD

Upon motion of a party, summary judgment is appropriate if, "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . .  admissions, interrogatory answers, or other materials," the moving party persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party."  FED. R. CIV. P. 56(c); Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).  An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue.  See

---

[6] At oral argument, counsel for Ms. Ramage abandoned her FMLA interference claim, stating, "[w]e abandoned our FMLA interference claim.  We didn't make an argument on that in our response to defendants' motion."  (Oral Argument Tr. at 14).  Accordingly, the Court will grant summary judgment to the Defendants on Ms. Ramage's FMLA interference claim.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if its resolution could affect the result of the suit under governing law.  Id.

In evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.  Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  If, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. 217, 322 (1986); Wisniewski v. Johns–Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

## IV.   DISCUSSION

### A.  ADA and PHRA Discrimination Claims[7]

This Court applies the McDonnell Douglas burden-shifting analysis to claims of discrimination on the basis of disability.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973).  Under this framework, the plaintiff must first establish a *prima facie* case of discrimination.  To set forth a *prima facie* case of discrimination under the ADA, Ms. Ramage must demonstrate that (1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of her job with or without reasonable accommodation by the employer; and (3) she has suffered an otherwise adverse employment decision as a result of discrimination.  Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000); Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999).  In the event Ms. Ramage

---

[7] Because the PHRA is interpreted "in accord with its federal counterparts," Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996), the Court's analysis under the ADA will apply with equal force to Ms. Ramage's PHRA claim.  See Castellani v. Bucks Cnty. Mun., 351 Fed. App'x 774, 778 (3d Cir. 2009).

establishes a *prima facie* case of discrimination, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action.  Shaner, 204 F.3d at 500 (citing McDonnell Douglas, 411 U.S. at 802).  Should the defendant carry this burden, the plaintiff then must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were a pretext for discrimination.  Id.

The Defendants argue that Ms. Ramage has failed to establish a *prima facie* case of disability discrimination because she is not a disabled person within the meaning of the ADA and, consequently, does not qualify for its protections.  "A person qualifies as 'disabled' under the ADA if [s]he: (1) has a physical or mental impairment that substantially limits one or more of h[er] major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment."  Keyes v. Catholic Charities of the Archdiocese of Phila., 415 Fed. App'x 405, 409 (3d Cir. 2011) (citing 42 U.S.C. § 12102(2)).  Ms. Ramage asserts that she qualifies as disabled under the ADA because she suffered from an impairment that substantially limits a major life activity and, in the alternative, that the Defendants regarded her as having such an impairment.  The Court will discuss each of these arguments in turn.

### 1.  Actual disability

To qualify as actually disabled under the ADA, an individual must suffer from an impairment that substantially limits a major life activity.  A diagnosis alone is not sufficient to establish an ADA disability.  Tice v. Centre Area Transp. Auth., 247 F.3d 506, 513 n.5 (3d Cir. 2001).  The ADA requires plaintiffs to submit not only evidence of a medical diagnosis, but to "offer[ ] evidence that the extent of the limitation caused by their impairment in terms of their

own experience is substantial." Toyota Motor. Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198

(2002).  In other words, the touchstone of whether an impairment rises to the level of a disability

under the ADA is "whether the limitation is substantial, that is, what the *effect* that impairment

has on the life of the individual." Overturf v. Penn Ventilator, Co., Inc., 929 F. Supp. 895, 898

(E.D. Pa. 1996) (citation omitted) (emphasis in original).

When determining whether an impairment substantially limits a major life activity, courts

examine (1) the nature and severity of the impairment, (2) the duration or expected duration of

the impairment, and (3) the permanent or long-term impact or the expected permanent or long-

term impact of or resulting from the impairment.[8] Emory v. AstraZenaca Pharm., LP, 401 F.3d

174, 180 (3d Cir. 2005) (citing 29 C.F.R. § 1630.2(j)(2)).  EEOC regulations define

"substantially limited" as an inability "to perform a major life activity that the average person in

the general population can perform," or a significant restriction "as to the condition, manner, or

duration under which an individual can perform a particular major life activity as compared to

the condition, manner, or duration under which the average person in the general population can

perform that same major life activity." Emory, 401 F.3d at 180 (citing 29 C.F.R. § 1630.2(j)(1)).

Consequently, "[t]he determination of whether one is or is not disabled within the meaning of the

ADA is an individualized one to be made on a case-by-case basis." Davis v. Davis Auto, Inc.,

No. 10-3105, 2011 WL 5902220, at *5 (E.D. Pa. Nov. 22, 2011) (citing Bley v. Bristol Twp.

Sch. Dist., No. 05-0029, 2006 WL 220669, at *5 (E.D. Pa. Jan. 25, 2006).

---

[8] Although Congress recently enacted the ADA Amendments Act of 2008 ("ADAAA"), the effective date of the ADAAA was January 1, 2009.  See Pub. L. No. 110-325, 122 Stat. 3553 (2008).  Courts in the Third Circuit have declined to apply the ADAAA retroactively to discriminatory conduct occurring before January 1, 2009. See, e.g., Seibert v. Lutron Elec., No. 08-5139, 2009 WL 4281474, *7 n.4 (E.D. Pa. Nov. 30, 2009) (citing Landgraf v. USI Film Prods., 511 U.S. 244, 280 (1994)).  In light of the Third Circuit Court of Appeals' ruling that the ADAAA does not apply retroactively, Britting v. Sec., Dep't of Veterans Affairs, 409 Fed. App'x 566, 569 (3d Cir. 2011), the Court must apply the narrower, pre-ADAAA, interpretation of "disability" to Ms. Ramage's claims.

The record is not entirely clear about what precise impairment is the source of Ms. Ramage's purported disability.  In her deposition, Ms. Ramage identified her brain tumor and the subsequent surgery she underwent in May 2008 as the health condition that forms the basis of her disability.  (Pl. Dep. 174:21-175:21).  At oral argument, Ms. Ramage's attorneys focused almost exclusively on Ms. Ramage's migraine headaches without reference to the brain tumor.  (Oral Argument Tr. at 16-17).  It is unclear from the record evidence, however, whether these migraine headaches were associated with Ms. Ramage's brain tumor or were an independent medical condition.[9]  Additionally, at various points in her opposition brief, Ms. Ramage inexplicably asserted that her disability was Attention Deficit Disorder ("ADD").[10]  Pl. Opp. Br. at 12.  For the purposes of this Motion, however, the Court must view the facts in the light most favorable to Ms. Ramage, and will therefore address Ms. Ramage's migraines and brain tumor as though they are one impairment.

The Defendants argue that in spite of the tumor, its alleged effects, and the migraine headaches, Ms. Ramage was unable to identify a single major life activity that was limited by her condition.  In her opposition brief, Ms. Ramage made a vague allusion to "walking into walls due to her tumor affecting her vision and ability to focus" prior to her surgery.  Pl. Opp. Br. at 25.  However, at oral argument, when asked directly "what the major life activity is" that was

---

[9] Indeed, the two most recent medical examination reports cited by Ms. Ramage list "migraines" and "pituitary adenoma" as separate items under her "Past Medical History."  (Pl. Ex. FF, 11/29/2009 Medical Record; Pl. Ex. GG, 4/30/2009 Medical Record).  Likewise, Ms. Ramage testified that she had experienced migraine headaches "for years" prior to her surgery (Pl. Dep. 169:20-21), and a September 2008 medical report indicated that "[s]he has a long history of migraine headaches . . . ." (Pl. Ex. P).

[10] Ms. Ramage has offered no medical records confirming that she was diagnosed with ADD, and more importantly, has offered no evidence that the condition substantially limited any of her major life activities beyond the fact that she relied on notes to perform her job duties.  (Pl. Dep. 94:14-20); see generally Collins v. Prudential Inv. and Ret. Servs., 119 Fed. App'x 371, 376 (3d Cir. 2005) (characterizing the plaintiff's ADD and ADHD's impact on her thinking as moderate and noting that "[h]ealth conditions that cause moderate limitations on major life activities do not constitute disabilities under the ADA.").  The use of notes to do one's job does not constitute a substantial limitation by any stretch of the imagination.

substantially limited by her condition, counsel for Ms. Ramage responded only with "thinking and sleeping," the first time Ms. Ramage explicitly identified any particular major life activities limited by her condition.  (Oral Argument Tr. at 15-16).  For the purposes of this motion, the Court will assume that Ms. Ramage claims that her impairments substantially limited her ability to sleep, think, *and* see.

The Court must now determine whether the record evidence supports Ms. Ramage's claims that her impairment substantially limited these major life activities.

### i.       Sleeping

"Difficulty sleeping is a common problem, and not a limitation of a major life activity unless the plaintiff shows a uniquely severe affliction."  Sloan v. City of Pittsburgh, 110 Fed. App'x 207, 212 (3d Cir. 2004); see also Keyes, 415 Fed. App'x at 409-10 (holding that a plaintiff suffering from sleep apnea who would wake up at night "gasping for air" was not substantially impaired in his ability to sleep); Smyth v. Wawa, Inc., No. 06-4474, 2008 WL 741036, at *13 (E.D. Pa. Mar. 19, 2008) (noting that three doctors' notes indicating the plaintiff was "having trouble sleeping" fell short of suggesting a severe affliction that would qualify the plaintiff as disabled); cf. Peter v. Lincoln Tech. Inst., Inc., 255 F. Supp. 2d 417, 434 (E.D. Pa. 2002) (holding a plaintiff was substantially impaired in his ability to sleep where he woke up five to six times per night due to "severe sleep apnea").

Ms. Ramage identifies various medical examination reports from consultations with her neurologist, Dr. Gilbert S. Tausch, in support of her claim that her ability to sleep was substantially limited during the relevant period.  However, only one of these reports makes

reference to Ms. Ramage's sleep patterns during the relevant time period.[11]  Unlike the two later

reports, which at least make specific note of Ms. Ramage having "difficulty sleeping" or

"sleep[ing] poorly," this report merely explains that Ms. Ramage gets headaches four times per

week, and, in particularly vague fashion, notes that she "often awakens with them."  (Pl. Ex. P).

The report makes no reference to how frequently Ms. Ramage's sleep is actually interrupted, or if

it is interrupted at all.  Accordingly, the Court is not convinced that this report demonstrates that

Ms. Ramage's purported difficulty sleeping constituted a "uniquely severe affliction."

   Due to the minimal record evidence of Ms. Ramage's difficulty sleeping, a reasonable

jury could not conclude that Ms. Ramage is substantially limited in the major life activity of

sleeping.

###    ii.   Thinking

   As with sleeping, there is scant record evidence in support of Ms. Ramage's claim that

her ability to think was substantially limited during the relevant period.  Nevertheless, Ms.

Ramage attempts to link her migraine headaches and her loss of memory to her assertion that her

ability to think was substantially limited.[12]

   First, the record is devoid of any evidence connecting Ms. Ramage's impairment with an

inability to think other than a conclusory statement at oral argument by her attorney that her

---

[11] The other two reports—which are the only reports to which Ms. Ramage actually cites in support of her assertion that she has a substantial limitation in her ability to sleep—summarize consultations that occurred well outside the relevant time period.  In the first report, which occurred seven months after her termination, Dr. Tausch noted that Ms. Ramage "sleeps poorly," grinds her teeth, and "awakens with clenched fists."  (Pl. Ex. GG).  The second report, from over a year after her termination, mirrors the first and notes that she has lost several teeth on account of her teeth grinding.  (Pl. Ex. FF).  "The ADA requires that a person be substantially impaired contemporaneous with his or her seeking accommodation."  <u>Bialko v. Quaker Oats Co.</u>, 434 Fed. App'x 139, 142 (3d Cir. 2011).

[12] At oral argument, counsel for Ms. Ramage referred to Ms. Ramage's testimony that "she felt she was overwhelmed" when she returned to work following her surgery and "wasn't ready to take on as many tasks as [she] had been doing prior to going out to have the operation."  (Oral Argument Tr. at 17; Pl. Dep. 173:10-22).  However, a general sense of being overwhelmed does not constitute a substantial limitation of a major life activity.

medical records "evince the severity and the chronic nature of her persistent migraines and the effect they had on . . . her ability to think." (Oral Argument Tr. 16). Contrary to her attorney's representations, Ms. Ramage's medical records do not make any connection between her migraine headaches and her ability to think. (Pl. Exs. P, FF, GG). In fact, Dr. Tausch noted on September 19, 2008, just a week before her termination, that Ms. Ramage's attention span was "normal," her fund of knowledge was "appropriate," and she was "an alert and oriented person." (Pl. Ex. P). Additionally, Ms. Ramage admitted in her deposition testimony that her headaches were worse prior to her brain surgery, and that despite these more severe headaches, she never missed a day of work because of them. (Pl. Dep. 172:20-173:1). She then admitted that following the surgery, she has been able to control the effects of her migraines with Excedrin. (Pl. Dep. 173:2-5). See Sutton v. United Air Lines, Inc., 527 U.S. 471, 475 (1999) (holding that under pre-ADAAA law, when assessing whether an impairment substantially limits a major life activity, courts must consider all mitigating measures). Ms. Ramage cites no record evidence suggesting that her migraine headaches or her brain tumor affected her ability to think in any way.

Second, the record evidence similarly does not support Ms. Ramage's assertion that her purported memory loss had any effect on her major life activity of thinking during the relevant time period. Ms. Ramage's claim that her memory loss substantially limited her ability to think is undermined by Dr. Tausch's treatment notes of September 19, 2008, in which he observed that Ms. Ramage's "short-term memory" was "3/3 in 5 minutes," and her long-term memory was "intact for events of December 7, 1941." (Pl. Ex. P). In fact, the first indication in the record that Ms. Ramage had any memory loss is contained in the April 2009 medical report of Dr.

Tausch, over seven months after her termination.  (Pl. Ex. GG) ("She also describes memory problems.  She is having trouble remembering where she put objects.  This she tells me is new."). Aside from being outside the relevant time period, Dr. Tausch's November 29, 2009 examination suggests that Ms. Ramage's memory loss was unrelated to her brain surgery or other neurological issue.  (Pl. Ex. FF) (observing that Ms. Ramage is "now describing difficulty with her memory. She scores 29/30 on a Mini-Mental Status Examination.  I think this is more likely depression and anxiety than a primary memory problem.").  This is consistent with Ms. Ramage's testimony that since her termination she has suffered from depression.  (Pl. Dep. 228:10-229:7).

In light of the paucity of record evidence, a reasonable jury could not conclude that Ms. Ramage is substantially limited in the major life activity of thinking.

### iii.        Seeing

Finally, the record does not support Ms. Ramage's claim that her impairment substantially limited her ability to see.  Ms. Ramage testified that beginning sometime in March 2008, she began to lose vision in her left eye, lost some peripheral vision, and "was banging into walls" as a result.  (Pl. Dep. 153:11-14; Pl. Ex. H).  However, the evidence is clear that almost immediately following her surgery, the vision in her left eye returned, (Pl. Ex. H) ("She recovered vision in her left eye following surgery. . ."); (Pl. Ex. I) ("Her vision continues to improve. . ."), her peripheral vision was thereafter only limited "underneath [her] nose," and the effect was that she was merely "clumsier." (Pl. Dep. 170:18-19; 171:15-172:16).

"Impairments of a limited duration are not considered disabilities."  Overturf, 929 F. Supp. at 898 n.2; see also Pollard v. High's of Baltimore, Inc., 281 F.3d 462, 468 (4th Cir. 2002)

("An impairment simply cannot be a substantial limitation on a major life activity if it is expected to improve in a relatively short period of time."). Ms. Ramage's vision began to deteriorate only two to three months before her surgery in May 2008. Thereafter, her vision improved markedly. The two to three month period prior to her surgery certainly does not qualify as "permanent or long-term." See Toyota Motor Mfg., 534 U.S. 196. Furthermore, Ms. Ramage's residual loss of peripheral vision "underneath [her] nose" does not qualify as a substantial limitation on her ability to see. See Congleton v. Weil McLain, No. 01-2237, 2003 WL 22100877, at *4 (E.D. Pa. Aug. 19, 2003) (finding no reasonable jury could conclude that plaintiff's lack of depth perception, limited field of vision, no peripheral vision on his left side, and an inability to see objects on his left side clearly, constituted a condition substantially limiting a major life activity); Overturf, 929 F. Supp. at 898 (finding no reasonable jury could conclude that plaintiff's loss of peripheral vision due to a brain tumor substantially limited him in his ability to see).

In sum, Ms. Ramage's impaired vision does not qualify as a substantial limitation on a major life activity under pre-ADAAA law.

\*     \*     \*

While the Court is not unsympathetic to Ms. Ramage's impairments, there is insufficient evidence to create a genuine issue of fact as to whether her brain tumor and migraine headaches substantially limited her ability to sleep, think, or see. Because Ms. Ramage is unable, as a matter of law, to establish a *prima facie* case of actual disability discrimination, the Court will grant Defendants' Motion for Summary Judgment with respect to that claim.

### 2.   Perceived disability

Although Ms. Ramage is unable to establish that her impairment substantially limited her in a major life activity, her disability discrimination claim may still proceed if she is able to establish that the Defendants regarded her as disabled.  A plaintiff may be "regarded as" disabled if: (1) she has a physical or mental impairment that does not substantially limit major life activities but is treated by the covered entity as constituting such impairment; (2) she has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (3) she has no such impairment but is treated by a covered entity as having a substantially limiting impairment.  29 C.F.R. § 1630.2(l); Taylor, 177 F.3d at 187; Tice, 247 F.3d at 514.  In any case, the definition of "substantially limits" remains the same as it does in other parts of the statute.  Tice, 247 F.3d at 514 (citation omitted).

"[A]n inquiry into how an employee was 'regarded' is necessarily quite fact-specific, and all of the surrounding circumstances may be relevant in reaching a conclusion."  Id. at 515. "[E]ven an innocent misperception based on nothing more than a simple mistake of fact as to the severity, or even the very existence, of an individual's impairment can be sufficient to satisfy the statutory definition of a perceived disability."  Deane v. Pocono Med. Ctr., 142 F.3d 138, 144 (3d Cir. 1998).  However, "to be covered under the 'regarded as' prong of the ADA the employer must regard the employee to be suffering from an impairment within the meaning of the statutes, not just that the employer believed the employee to be somehow disabled."  Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 381 (3d Cir. 2002).  Consequently, liability only attaches to a "mistake that leads the employer to think that the employee is substantially limited in a major life activity."  Taylor, 177 F.3d at 192.

16

Ms. Ramage has failed to specify which major life activities her employer perceived as being substantially limited by her brain tumor and migraines. Therefore, as with her actual disability discrimination claim, the Court will assume that Ms. Ramage similarly asserts that the Defendants regarded her as being substantially limited in the major life activities of thinking and seeing.[13] However, instead of offering evidence that the Defendants regarded her as being substantially limited in her ability to think and see, Ms. Ramage merely lists seven purported pieces of evidence that she claims "would allow a trier of fact to conclude that Ms. Ramage may have been terminated due to her perceived disabilities." Pl. Opp. Br. at 28. The Court will examine each of the seven pieces of evidence cited by Ms. Ramage in relation to these major life activities, in turn.

The first two purported pieces of evidence relate solely to the Defendants' knowledge of Ms. Ramage's conditions. First, Ms. Ramage asserts that the Defendants knew she was walking into walls right before she went on medical leave, and second, she notes that the Defendants knew she was undergoing brain surgery. Pl. Opp. Br. at 28. However, mere awareness of a condition or impairment "alone is insufficient evidence to sustain a claim of disability under the 'regarded as' prong." Gallagher v. Sunrise Assisted Living of Haverford, 268 F. Supp. 2d 436, 441 (E.D. Pa. 2003); Kelly, 94 F.3d at 109. Moreover, the Defendants only knew of Ms. Ramage's diagnosis and subsequent brain surgery as of May 23, 2008, or four days before her surgery. Therefore, the Defendants cannot be imputed with knowledge for any time prior to May 23, 2008.[14]

---

[13] There is no evidence in the record that the Defendants knew of Ms. Ramage's purported sleeping difficulties, nor does Ms. Ramage suggest as such. Consequently, the Court concludes that there is no genuine issue of fact as to whether the Defendants regarded Ms. Ramage as substantially limited in her ability to sleep.

[14] Ms. Ramage testified that Ms. Tinari told her in March 2008, when she first started to lose her sight, and almost three months before she took her FMLA leave that "if you don't stop knocking into the walls and stuff, I'm going to have put you out on disability or something." (Pl. Dep. 153:18-22). While the Court agrees that this comment, if made, was at a minimum ill-advised, inconsiderate, and an exercise in poor judgment, the Court does not believe that

Third, Ms. Ramage asserts that the Defendants threatened to terminate her upon her return to work.  Pl. Opp. Br. at 28.   An alleged threat to terminate an employee upon her return from leave in this context is not probative of whether the employer regarded her as substantially limited in her ability to see or think.  Moreover, the "evidence" Ms. Ramage relies on in her opposition brief and Statement of Facts for this point is nothing more than an excerpt of a *question* posed to Ms. Ramage at her deposition —not actual testimony—based on a document that is not part of the record before the Court.  (Pl. Stmt. Facts ¶ 40; Pl. Dep. 200:2-4).  This excerpt of Ms. Ramage's deposition transcript does not qualify as evidence of whether her employer regarded her as disabled.

Fourth, Ms. Ramage asserts that the Defendants treated her differently when she returned to work.  Pl. Opp. Br. at 28.   Presumably, Ms. Ramage refers to her testimony that upon her return to work, the "whole tone and attitude" toward her changed, there was "a definite hostility towards" her, she felt some of the people at Rescot "thought that [she] was less than whole," and she was made to feel "like [she] was a moron."  (Pl. Dep. 129:19-24, 130:1; 174:14-20, 177:5-14, 181:8-11).  While Ms. Ramage's testimony about how she felt and her general impressions of her

---

it, on its own or even in conjunction with other evidence, is sufficient to establish that the Defendants regarded Ms. Ramage as suffering from an impairment that substantially limited her ability to see either at the time the comment was made or in the months leading up to her termination, particularly given that Ms. Tinari did not have the discretion to terminate Ms. Ramage on her own.  "[S]tray remarks from co-workers, even those implicating an employee's disability or suggesting disqualification from her job, are not alone sufficient to raise the critical inference."  Anderson v. Radio One, Inc., No. 09-194, 2010 WL 3719088, at *10 (E.D. Pa. Sept. 20, 2010) (citing Ross, 347 F. Supp. 2d at 200 (holding that employee relations manager's statement that, "with your kind of disability you should not be working here" did not demonstrate belief that plaintiff was impaired in ability to perform major life activity.")).  Additionally, it is unclear what impairment, or even what major life activity, Ms. Tinari's comment implicates.  At the time Ms. Tinari allegedly made the comment, Ms. Ramage had not yet been diagnosed with a brain tumor, and was just beginning to experience vision difficulties.  To fall within the "regarded as" prong of the ADA, the employer must "regard[ ] the employee to be suffering from an impairment within the meaning of the statutes, not just that the employer believed the employee to be somehow disabled."  Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 381 (3d Cir. 2002); Ross v. Kraft Foods North America, Inc., 347 F. Supp. 2d 200, 204 (E.D. Pa. 2004).  At most, this comment suggests that Ms. Tinari may have believed Ms. Ramage was "somehow disabled," not that she was suffering from an impairment within the meaning of the statute.

fellow employees' attitudes toward her are relevant, they do not raise a genuine issue of fact as to whether her employer regarded her as substantially limited in her ability to see or think.

Fifth, relying solely on her own testimony, Ms. Ramage contends that Ms. Joanne Sullivan "referred to [Ms. Ramage] every day as a 'moron' indicating a belief that Ms. Ramage lacked intellect following her brain surgery." Pl. Opp. Br. at 28. The record evidence, however, does not support Ms. Ramage's assertion. Ms. Ramage did not testify that Ms. Sullivan "referred to her as a moron," but instead testified that "[b]asically I mean she all but called me a moron every day." (Pl. Dep. 178:2-4). There is a big difference between "calling someone a moron," and "all but calling someone a moron," particularly where the plaintiff asserts that her employer regarded her as substantially limited in her ability to think. Equally misleading about Ms. Ramage's assertion in her brief was that Ms. Sullivan's supposed name-calling "indicat[ed] a belief that Ms. Ramage lacked intellect following her brain surgery." At her deposition, when asked whether Ms. Sullivan's treatment began after she returned from surgery, Ms. Ramage responded, "She was always a bully. She was always the office bully. I mean the yelling, the cussing, the screaming that I entailed [sic] for seven years." (Pl. Dep. 178:2-10). Although Ms. Ramage asserted that Ms. Sullivan's antics worsened when she returned from surgery—specifically noting that Ms. Sullivan "growled" at her daily—it is clear from Ms. Ramage's testimony that Ms. Sullivan's inappropriate behavior had been occurring long before Ms. Ramage even began experiencing symptoms of her condition.

Moreover, Ms. Sullivan was not Ms. Ramage's supervisor and, although she periodically assigned work to Ms. Ramage, Ms. Sullivan had no role in the decision to terminate her. See Sizemore v. Con. Rail Corp., 56 Fed. App'x 582, 584 (3d Cir. 2011) (suggesting that the

19

comments of a non-supervisory employee with no employment decisional authority carry less weight as to whether the employer regarded an employee as disabled).  If, in fact, Ms. Sullivan was Ms. Ramage's supervisor, had authority to terminate her, and Ms. Ramage had any evidence that Ms. Sullivan began calling her a "moron" every day after she returned to work, as she asserts in her brief and Statement of Facts, this could be a much closer case.  (Pl. Stmt. Facts ¶ 14). However, that is simply not what happened here.

Sixth, Ms. Ramage asserts in her brief that she "was not allowed [to] take certain time off from work for health reasons."  Pl. Opp. Br. at 28-29.  However, the record does not support this assertion.  Ms. Ramage testified at her deposition that there was "one appointment" that she had to reschedule because "something happened in the office that they needed [her] to stay."  (Pl. Dep. 168:5-10).  Additionally, Ms. Ramage testified that was able to attend the rescheduled appointment.  (Pl. Dep. 168:11-13).  Regardless, the Court does not see how the Defendants' failure to grant Ms. Ramage an accommodation would necessarily be evidence of them regarding her as substantially limited in her ability to see or think.

Finally, seventh, Ms. Ramage contends that "concerns were expressed about her health by upper management 1 day before her termination in relation to health insurance indicating a concern that Ms. Ramage would continue to have serious health problems into the future."  Pl. Opp. Br. at 29.  Ms. Ramage testified that she "believe[d] actually when [she] was discussing with Glen [Lloyd] the day before [she] was fired, [she] think[s] he brought [the] possibility up," that her condition "might put the company in a higher insurance bracket, possibly."  (Pl. Dep. 184:2-18).  However, she was unable to recall with any specificity exactly what Mr. Lloyd said to her, or how it fit into the conversation.  Additionally, contrary to her assertions in her opposition brief,

Ms. Ramage offered no evidence or testimony regarding whether the Defendants had any concern

that Ms. Ramage would continue to have serious health problems in the future.  Regardless, Mr.

Lloyd's alleged statement, merely acknowledges that Ms. Ramage has a medical condition, not

that he regarded her as being substantially limited in her ability to see or think.

Because Ms. Ramage is unable, as a matter of law, to establish a *prima facie* case of

perceived disability discrimination, the Court will grant Defendants' Motion for Summary

Judgment with respect to that claim.

### C.  ADA, PHRA, and FMLA Retaliation Claims[15]

Ms. Ramage's inability to identify a genuine issue of material fact as to whether she is

disabled or regarded as disabled by the Defendants under the ADA is not fatal to her claims of

retaliation under the ADA, PHRA, and FMLA.  Ms. Ramage alleges that her position with Rescot

was terminated in retaliation for requesting and taking FMLA leave.  Under these statutes,

employers are prohibited from taking adverse employment actions against an employee in

retaliation to the employee engaging in a protected activity irrespective of whether the employee is

actually disabled or regarded as disabled.  See 42 U.S.C. § 12203(a).

As with discrimination claims, retaliation claims under the ADA, PHRA, and FMLA are

analyzed under the McDonnell Douglas burden-shifting framework outlined above.  See Weston

v. Pennsylvania, 251 F.3d 420, 432 (3d Cir. 2001).  Accordingly, if Ms. Ramage is able to

establish a *prima facie* case of retaliation, the burden shifts to the Defendants to demonstrate a

---

[15] The analysis of retaliation claims under the ADA, PHRA, and FMLA are almost identical.  The only difference is that instead of engaging in a "protected activity" to satisfy the *prima facie* case as is required under the ADA and PHRA, for an FMLA violation, the plaintiff must have taken an FMLA leave.  Because Ms. Ramage asserts that the protected activity she engaged in for her ADA and PHRA claims was taking FMLA leave, the analysis for all three claims is identical.  Therefore the Court will analyze all three of these claims together.

non-discriminatory reason for her termination, and Ms. Ramage would then need to show that the

asserted legitimate reason for her termination was a pretext for discriminatory retaliation.

McDonnell Douglas, 411 U.S. at 802-03.  To establish a *prima facie* case of retaliation, a plaintiff

must show: (1) protected employee activity; (2) adverse action by the employer either after or

contemporaneous with the employee's protected activity; and (3) a causal connection between the

employee's protected activity and the employer's adverse action.  Williams v. Phila. Housing

Auth. Police Dep't., 380 F.3d 751, 759 (3d Cir. 2004).

        The parties do not dispute that Ms. Ramage engaged in a protected activity when she

requested six weeks of FMLA leave and periodic time off thereafter to recover from her brain

surgery, or that the Defendants discharged her on September 26, 2008 after she engaged in a

protected act.  Therefore, Ms. Ramage need only establish a causal connection between the two to

set forth a *prima facie* case of retaliation.

        Ms. Ramage has presented sufficient evidence from which a reasonable jury could find

that a causal connection existed between her FMLA leave and her September 26, 2008

termination.  Where the temporal proximity between the protected activity and the termination are

"unusually suggestive of retaliatory motive," it can itself be sufficient to establish a causal link.

Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 n.9 (3d Cir. 2003); Schofield v. Metro.

Life Ins. Co., 252 Fed. App'x 500, 504 (3d Cir. 2007).  The Defendants terminated Ms. Ramage

only two and a half months after she returned from her FMLA leave.  This temporal proximity is

sufficient to satisfy the causal connection prong of her *prima facie* case.  See Fasold v. Justice,

409 F.3d 178, 190 (3d Cir. 2005) (finding adverse action taken within three months of protected

activity gave rise to an inference of causation); <u>Nesselrotte v. Allegheny Energy, Inc.</u>, No. 06-1390, 2009 WL 703395, at *12 (W.D. Pa. Mar. 16, 2009) (same).

Additionally, Ms. Ramage's extensive deposition testimony adds further weight to her claim that there exists a causal connection between her FMLA leave and her termination. Ms. Ramage's testimony includes, but is not limited to, the following:

- During Ms. Ramage's leave of absence, Ms. Tinari repeatedly called Ms. Ramage's treating physicians to inquire when she would return, a practice Ms. Ramage testified made her feel guilty about missing work.  (Pl. Dep. 117:16-24, 162:4-11, 163:3-7).

- When Ms. Ramage addressed with Ms. Tinari perceived pressure from a co-worker to return to the office, Ms. Tinari told her to "blow it off."  (Pl. Dep. 168:14-169:15).

- Following Ms. Ramage's return from extended medical leave, Ms. Tinari, told her, "gee, last year you were out of work around this time for a back injury, and now this year it's for a brain tumor, I wonder what you're going to do next year to top this."  (Pl. Dep. 65:9-13).

- Upon Ms. Ramage's return to work, the "whole tone and attitude" toward her changed, there was "a definite hostility towards" her, she felt some of the people at Rescot "thought that [she] was less than whole," and she was made to feel "like [she] was a moron." (Pl. Dep. 129:19-24, 130:1; 174:14-20, 177:5-14, 181:8-11).

- In a conversation with Ms. Tinari's husband after her surgery, he told Ms. Ramage that Ms. Tinari was "going to use [her] brain tumor to make [her] look incompetent."  (Pl. Dep. 194:15-18, 195:7-9, Ex. T, Ramage Notes).

- In a conversation with her supervisor, Mr. Lloyd, the day before she was fired, "[Ms. Ramage] think[s] he brought [the] possibility up," that her condition "might put the company in a higher insurance bracket, possibly." (Pl. Dep. 184:2-18).

This testimony, along with the close temporal proximity of her FMLA leave to her termination, is sufficient evidence to satisfy the burden to establish a *prima facie* retaliation case. Accordingly, the burden now shifts to the Defendants to produce evidence of a legitimate, non-retaliatory reason for Ms. Ramage's termination.

The Defendants' purported non-discriminatory reason for Ms. Ramage's termination was that Ms. Ramage allegedly sent inappropriate e-mail communications, engaged in inappropriate workplace behavior, and showed a general lack of professionalism over a prolonged period of time. The Defendants point to Ms. Ramage's inappropriate September 25, 2008 e-mail to Ms. Sullivan, her October 2006 written warning regarding her use of e-mail communications, and her previous three yearly performance reviews, as evidence in support of their purported legitimate reason for her termination. Given the Defendants' relatively light burden of production, this is ample evidence to satisfy that burden.

As evidence that the Defendants' proffered reasons are merely pretext for retaliation, Ms. Ramage points again to her testimony set forth above, the temporal proximity, as well as various pieces of circumstantial evidence. For example, Ms. Ramage asserts that hardly any employees followed the policies which she violated and were cited as the catalysts for her termination. (Pl. Stmt. Facts ¶¶ 96-99). Second, she notes that Ms. Sullivan, who openly cursed in the workplace and had sent similar or worse e-mails to employees, was not terminated for violating company policies but instead sent to an anger management class. (Pl. Stmt. Facts ¶¶ 105-11). Third, she

notes that employees were rarely fired from Rescot except in extreme circumstances, such as hosting a pornographic website from the company's servers.  (Pl. Stmt. Facts ¶ 100).

Viewing the facts in the light most favorable to Ms. Ramage, there is sufficient evidence in the record to raise a genuine issue of material fact as to whether the Defendants retaliated against Ms. Ramage for engaging in a protected activity under the ADA, PHRA, and FMLA. Therefore, the Court must deny Defendants' Motion for Summary Judgment on this claim.

### D.  ADA and PHRA Hostile Work Environment

Finally, Ms. Ramage asserts that she was subjected to a hostile work environment pursuant to the ADA and PHRA following her return from FMLA leave in July 2008.  "A claim for hostile work environment based on disability requires an evidentiary showing that, inter alia, the plaintiff is a qualified individual with a disability under the ADA."  Amorosi v. Molino, No. 06-5524, 2009 WL 737338, at *7 (E.D. Pa. Mar. 19, 2009) (citing Walton v. Mental Health Ass'n of Se. Pa., 168 F.3d 661, 667 (3d Cir. 1999)).  As discussed above, Ms. Ramage is unable to establish that she was a qualified individual with a disability, and consequently, she cannot make out a *prima facie* case for a hostile work environment based on disability discrimination.

Accordingly, because Ms. Ramage is unable, as a matter of law, to establish a *prima facie* case for a hostile work environment, the Court will grant Defendants' Motion for Summary Judgment with respect to that claim.

### V.   CONCLUSION

For the reasons discussed above, the Defendants' Motion for Summary Judgment is denied with respect to Ms. Ramage's retaliation claims under the ADA, PHRA, and FMLA, and the

Motion is granted with respect to Ms. Ramage's discrimination claims under the ADA and

PHRA, her interference claim under the FMLA, and her hostile work environment claims under

the ADA and PHRA.

An appropriate order follows.


BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge